IN THE UNTIED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF GEORGIA, *ex rel.* JOSHUA WALTHOUR, <br><br> Plaintiffs, <br><br> v. <br><br> MIDDLE GEORGIA FAMILY REHAB, LLC, BRENDA G. HICKS a/k/a BRENDA TAYLOR, and CLARENCE HICKS, <br><br> Defendants. | Civil Action No. <br><br> _____ <br><br> **FILED UNDER SEAL** <br><br> Pursuant to 31 U.S.C. § 3730(b) <br><br> **FALSE CLAIMS ACT COMPLAINT** <br><br> **DO NOT PLACE IN PRESS BOX** <br> **DO NOT ENTER ON PACER** <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

COMES NOW Plaintiff Joshua Walthour ("Relator"), on behalf of the United States of America and the State of Georgia, and files this *qui tam* action against Middle Georgia Family Rehab, LLC ("MGFR"), Brenda G. Hicks a/k/a Brenda Taylor, and Clarence Hicks (hereinafter collectively referred to as "Defendants") to recover statutory damages, civil penalties, and other monetary relief under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA") and the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, *et seq*. ("Georgia FMCA").

## INTRODUCTION

1.      As more specifically alleged below, Defendants have committed various types of fraud against the Medicare, Medicaid, and TRICARE Programs (collectively, "Government Programs"). These types of fraud include billing for occupational and physical therapy services not rendered, upcoding for services provided, and billing the Government for services provided by unqualified personnel.

1

2.     As a result of these improper billing schemes, numerous false claims were submitted to Government-funded programs. Defendants' schemes caused the Government-funded programs to pay for reimbursements that would not have been made but for Defendants' illegal billing practices, which are specifically prohibited by federal and state laws, regulations, and policies.

3.     Defendants have actual knowledge that they are engaging in illegal misconduct, including knowledge that the reimbursements sought are not entitled to payment and that improperly obtained payments must be refunded to the Government, or have recklessly disregarded the relevant laws, regulations, and polices.  Defendants have chosen to profit from fraudulently billing Government Programs instead of disclosing the true nature and extent of the services they provide.

### JURISDICTION AND VENUE

4.     Pursuant to 28 U.S.C. § 1331, Defendants are subject to federal question jurisdiction in this Court because this action arises under the laws of the United States, including the FCA, 31 U.S.C. §§ 3729 and 3730, and other relevant federal statutes.  In addition, the FCA specifically confers jurisdiction upon the United States District Court.  *See* 31 U.S.C. § 3732(a).

5.     Supplemental jurisdiction for counts related to the Georgia FMCA arises under 28 U.S.C. § 1367, since these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  In addition, 31 U.S.C. § 3732(b) provides jurisdiction for "any action brought under the laws of any state for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730."  The state claims at issue here arise out of the same transaction or occurrence as the federal claims.

6.     Additionally, Defendants are subject to jurisdiction and venue in this Court where "one

defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C. § 3732(a). Accordingly, jurisdiction and venue are appropriate because, among other reasons, Defendants can be found, maintain offices, transact business, and reside in the Middle District of Georgia. In addition, acts proscribed by 28 U.S.C. § 3729 occurred in the Middle District of Georgia. Furthermore, venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a).

7.     Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided disclosure of the allegations of this Complaint to the United States of America and the State of Georgia prior to filing, as required by the relevant statutes. None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions as defined in 31 U.S.C. § 3730(e)(4)(A). Furthermore, if there has been a public disclosure of any of the allegations underlying this action, Relator qualifies as an original source of such information, pursuant to 31 U.S.C. § 3730(e)(4)(B).

## PARTIES

8.     Plaintiff Relator, Joshua Walthour, is a citizen of the United States of America and the State of Georgia, currently residing in Bonaire, Georgia. Relator is a Georgia-licensed occupational therapist (License # OT004738), who received his occupational therapy license on May 2, 2008, and has worked as an occupational therapist for the past ten years. Relator worked as an occupational therapist at MGFR from February 2018 to May 2018 and was responsible for performing patient evaluations and providing occupational therapy services to adult and pediatric patients.

9.     Relator's direct and firsthand knowledge of the fraudulent activity discussed herein began when he became employed with MGFR in February 2018. To his knowledge and belief,

3

Defendants' fraudulent conduct predated his employment at MGFR, beginning upon MGFR's inception as a business in July 2013, and continued after he left through the present.

10.     Defendant MGFR is a healthcare organization that provides physical therapy, occupational therapy, and speech therapy services to adults and children. MGFR is a domestic, limited liability company and is headquartered in Byron, Georgia. Its principal place of business is located at 100 Hamilton Pointe Drive, Suite 115, Byron, Georgia 31008. MGFR has a second office located at 5021 Mercer University Drive, Suite D-2, Macon, GA 31210.

11.     Defendant Brenda G. Hicks a/k/a Brenda Taylor is the CEO and Founder of MGFR. She owns ten percent of MGFR and is responsible for the conduct of MGFR and for the services billed to Government Programs, such as Medicare, Medicaid, and TRICARE. Defendant Brenda Hicks perpetrates the fraud alleged herein through Defendant MGFR, and upon information and belief, obtained ill-gotten gains from Defendant MGFR's fraudulent practices through her ownership stake in MGFR.

12.     Defendant Clarence Hicks is the husband of Defendant Brenda Hicks and owns thirty percent of MGFR. Upon information and belief, through his ownership stake in MGFR, Defendant Clarence Hicks has obtained ill-gotten gains from Defendant MGFR's fraudulent practices.

13.     The above-listed Defendants either bill Government Programs or have ownership and significant control over other Defendants who do so and are fully responsible for the conduct of these other Defendants, as well as all injuries and damages caused by them and all penalties, awards, and judgments entered against them.

14.     In addition, the above-listed Defendants either bill Government Programs, or have caused Government Programs to be billed, and have maintained possession, custody, or control of

certain property or money improperly obtained from Government Programs, which should have been reimbursed to those programs.

## THE LAW

### A. The Federal False Claims Act

15.     During all times relevant to the facts of this case, the federal FCA provided in pertinent part that:

> (a)     any person who - - (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit  money or property to the Government,

> * * * *

> is liable to the United States Government for a civil penalty of not less than $5,500.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410), plus three times the amount of damages which the Government sustains because of the act of that person.

> * * * *

> (b) . . . For purposes of this section (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud; (2) the term "claim" (A) means any request or demand, whether under contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States

Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . . (3) the term "obligation" means an established duty, whether or not fixed, arising from an expressed or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and (4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729 (2009).

## B. The Georgia False Medicaid Claims Act

16.    The Georgia FMCA states that any person who:

(1)    Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

* * * *

(7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program,

shall be liable to the State of Georgia for a civil penalty consistent with the civil penalties provision of the federal False Claims Act, 31 U.S.C. 3729(a), as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461; Public law 101-410), and as further amended by the federal Civil Penalties Inflation Adjustment Improvements Act of 2015 (Sec. 701 of Public Law 114-74), plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person.

O.C.G.A. § 49-4-168.l(a)(l)-(3) (2018).

17. Under subparagraph two of O.C.G.A. § 49-4-168, "knowing" and "knowingly" require no proof of specific intent to defraud and mean that a person, with respect to information:

> (A) Has actual knowledge of the information;
>
> (B) Acts in deliberate ignorance of the truth or falsity of the information; or
>
> (C) Acts in reckless disregard of the truth or falsity of the information.

18. The statute defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." O.C.G.A. § 49-4-168(3).

19. The statute defines "claim" as:

> any request or demand, whether under a contract or otherwise, for money, property, or services, which is made to the Georgia Medicaid program, or to any officer, employee, fiscal intermediary, grantee or contractor of the Georgia Medicaid program, or to other persons or entities if it results in payments by the Georgia Medicaid program, if the Georgia Medicaid program provides or will provide any portion of the money or property requested or demanded, or if the Georgia Medicaid program will reimburse the contractor, grantee, or other recipient for any portion of the money or property requested or demanded. A claim includes a request or demand made orally, in writing, electronically, or magnetically. Each claim may be treated as a separate claim.

O.C.G.A. § 49-4-168(1).

## FEDERAL HEALTHCARE PROGRAMS

20. The federal programs financially harmed by Defendants' wrongful conduct are Medicare, Georgia Medicaid, and TRICARE. Defendants submitted, or caused to be submitted, false and fraudulent claims to, and received money from, these Government Programs.

21. At all times relevant to the Complaint, the Medicare, Medicaid, and TRICARE Programs constituted a substantial source of revenue for Defendants.

*A.  The Medicare Program*

22.     In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease.  *See* 42 U.S.C. § 1395, *et seq.*

23.     The Medicare Program is administered by the Centers for Medicare and Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services ("HHS"), and is funded by the Medicare Trust Fund through payroll deductions taken from the work force of taxpayers, in addition to government contributions.

24.     Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government.  Under Medicare Part B, the federal government contracts with organizations, known as "carriers," to administer payment for services in specific geographic areas.  These carriers are charged with, and are responsible for, accepting Medicaid claims, determining coverage, and making payments from the Medicare Trust Fund.

25.     Medicare consists of four parts, including Part B, which covers a variety of services including medically necessary outpatient therapy, such as physical therapy and occupational therapy.

26.     ***Initial enrollment application and updates.***  To participate in Medicare, each provider must execute an initial enrollment application and may be required to update its enrollment information "as part of the periodic revalidation process."  CMS Form 855A, Sections 1, 5, Medicare Enrollment Application, Institutional Providers, *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf.  As part of

the provider's agreement with Medicare, the provider certifies that Medicare's payments are

conditioned upon its compliance with Medicare laws, regulations, and program instructions:

> 3. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction **complying with such laws, regulations, and program instructions** (including, but not limited to, the Federal Anti-Kickback Statute and the Stark law), and on the provider's compliance with **all applicable conditions of participation in Medicare**.
>
> \* \* \* \*
>
> 6.     I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*Id.* (emphasis added).

27.     After the initial certification, the provider, through its officers, has an **ongoing duty** to

notify Medicare if anything on the form becomes untrue or inaccurate:

> If I become aware that any information in this application is not true, correct, or complete, I agree to notify the Medicare fee-for-service contractor of this fact in accordance with the time frames established in 42 C.F.R. § 424.516(e).
>
> \* \* \* \*
>
> I agree to notify the Medicare contractor of any future changes to the information contained in this application in accordance with the time frames established in 42 C.F.R. § 424.516(e).

*Id.*

28.     ***Statements made with each claim.***  In addition to the initial and ongoing certifications,

each time a provider submits a claim, the submission must state, in boldface type:

> **(1)**     **"This is to certify that the foregoing information is true, accurate, and complete."**

> **(2) "I understand that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws."**

42 C.F.R. § 455.18(a). In order to avoid a provider overlooking the certification, either the statements themselves or a reference to them "must appear immediately preceding the claimant's signature." *Id.* at § 455.18(b).

29. A provider's certification is required whether a claim is submitted electronically or on paper: "The provider agrees to the following provisions for submitting Medicare claims electronically to [CMS]: . . . 7. That it will submit claims that are accurate, complete, and truthful . . . ." Medicare Claims Processing Manual, Ch. 24, § 30.2 A, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c24.pdf.

30. When submitting a claim to Medicare, Defendant MGFR must identify the name of the patient, the type of service(s) provided, the total charge(s), and the date of the service(s) and must certify, *inter alia*, the following: (1) "No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations . . . ."; (2) "[T]he foregoing information is true, accurate and complete . . . [and] payment and satisfaction of this claim will be from Federal and State funds, and . . . any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws"; (3) "Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws"; and (4) "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties." CMS Form 1500, Health Insurance Claim Form, *available at* https://www.cms.gov/Medicare/CMS-

Forms/CMS-Forms/downloads/cms1500805.pdf.

### B. *Medicare Regulations for Occupational Therapy and Physical Therapy Services*

31.     Medicare Part B covers medically necessary outpatient physical and occupational therapy under Sections 1861(g), 1861(p), 1861(s)(2)(D), and 1861(ll) of the Social Security Act. *See* 42 U.S.C. § 1395x.

32.     For outpatient occupational and physical therapy services to be covered by Medicare, such services must be reasonable and necessary. Medicare Benefit Policy Manual, Chapter 15, Section 220.1. The Medicare Benefit Policy Manual specifies that services are only payable if the services "are or were required because the individual needed therapy services." *Id.*, *see also* 42 C.F.R. § 424.24(c). Additionally, "[t]o be covered[,] services must be skilled therapy services as described in this chapter and be rendered under the conditions specified. Services provided by professionals or personnel who do not meet the qualification standards, and services by qualified people that are not appropriate to the setting or conditions are unskilled services . . . . Services that do not meet the requirements for covered therapy services in Medicare manuals are not payable using codes and descriptions as therapy services." *Id.* at Section 220.2A. Further, to be reasonable and necessary, "[t]he amount, frequency, and duration of the services must be reasonable under accepted standards of practice." *Id.* at Section 220.2B.

33.     Outpatient occupational therapy services must be "furnished by an individual meeting the qualifications in part 484 of this chapter for an occupational therapist or an appropriately supervised occupational therapy assistant." 42 C.F.R. § 410.59(a).

34.     In private practice settings, Medicare regulations require "direct supervision" of occupational therapy assistants by an occupational therapist. 42 C.F.R. § 410.59(c).

35.     Even when appropriately supervised, the Medicare Benefit Policy Manual clearly

indicates that occupational therapy assistants "may not provide evaluative or assessment services; make clinical judgments or decisions; develop, manage, or furnish skilled maintenance program services; or take responsibility for the service." Instead, "[t]hey act at the direction and under the supervision of the treating occupational therapist and in accordance with state laws." Medicare Benefit Policy Manual, Chapter 15, Section 230.2C.

36.     Similarly, outpatient physical therapy services must be "furnished by an individual meeting the qualifications in part 484 of this chapter for a physical therapist or an appropriately supervised physical therapy assistant." 42 C.F.R. § 410.60(a).

37.     All physical therapy services "not performed personally by the therapist must be performed by employees of the practice, directly supervised by the therapist, and included in the fee for the therapist's services." 42 C.F.R. § 410.60(c)(2).

38.     In private practice settings, appropriate supervision of physical therapy assistants requires direct supervision. Medicare Benefit Policy Manual, Chapter 15, Section 230.1C.

39.     Even when appropriately supervised, the Medicare Benefit Policy Manual clearly indicates that physical therapy assistants "may not provide evaluative or assessment services; make clinical judgments or decisions; develop, manage, or furnish skilled maintenance program services; or take responsibility for the service." Instead, "[t]hey act at the direction and under the supervision of the treating physical therapist and in accordance with state laws." Medicare Benefit Policy Manual, Chapter 15, Section 230.1C.

## C.  The Georgia Medicaid Program

40.     The Medicaid Program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant women or

children. The Medicaid Program is a jointly funded federal-state program and is administered by CMS at the federal level. Within broad federal rules, each state determines eligibility requirements for Medicaid, the services covered, payment levels for services, and administrative and operational procedures.

41.     Individual states pay providers directly, then obtain their federal share of the payment, which varies by state, from accounts funded by the United States Treasury. *See* 42 C.F.R. §§ 430.0, 430.30 (1994).

42.     In order to qualify for federal funds, the Georgia Medicaid program is required to implement a State Plan containing certain specific minimum criteria for coverage and payment of claims, as set forth by the federal Medicaid statute. *See* 42 U.S.C. § 1396a.

43.     The Georgia Department of Community Health ("DCH") is responsible for the administration and supervision of the Medicaid program. Georgia law authorizes DCH "to establish such rules and regulations as may be necessary or desirable in order to execute the [S]tate [P]lan and to receive the maximum amount of federal financial participation available in expenditures made pursuant to the [S]tate [P]lan . . . ." O.C.G.A § 49-4- 142(a). Georgia law also authorizes and requires DCH to "publish the terms and conditions for receipt of medical assistance in Policies and Procedures manuals for each of the categories of services authorized under the State Plan." Ga. Comp. R. & Regs. R. 350-1-.02(3). These manuals are disseminated to providers enrolled in the applicable category of service, and amendments thereto are effective "as specified by the Department at the time of dissemination." *Id*. Thus, DCH sets the rules for the provision of medical services to Georgia Medicaid recipients, the circumstances in which providers can become enrolled in Georgia Medicaid, and how Georgia Medicaid reimburses providers for these claims.

44.     DCH has also partially delegated administration of the Georgia Medicaid Program to Care Management Organizations ("CMOs"), which administer health plans and process and pay Medicaid claims to its contracted providers. At all times relevant to the Complaint, in order to enroll as a provider with CMOs, the provider must also be enrolled with DCH as a Medicaid provider; certify compliance with Part I, Policies and Procedures, for Medicaid/PeachCare for Kids; and verify it had access to and understood all applicable Medicaid manuals and policies.

45.     Georgia Medicaid providers, such as MGFR, submit claims for services rendered on behalf of Medicaid beneficiaries to DCH for payment, either directly or through a State designee, such as a fiscal intermediary ("Fee for Service Medicaid") or a CMO contractor.

46.     When submitting claims for payment, providers of services to Medicaid beneficiaries must identify, by provider number, who rendered the service and, by code, what services were provided.  Medicaid's fiscal intermediary, or its contractor CMO, uses these identifying numbers and codes to determine whether a claim should be paid and, if so, how much.

47.     All Georgia Medicaid providers that submit claims electronically must complete an Electronic Funds Transfer Agreement and agree to the following:

> Legal Compliance. Provider shall abide by all federal and state laws governing the Medicaid program.
>
> * * * *
>
> Provider further acknowledges and agrees that only Payees who have agreed in writing to: 1) comply with all Department policies regarding the payment of medical assistance; and 2) be subject to the recoupment policies outlined in the Provider's Statement of Participation and as set forth in the Power of Attorney for Electronic Claims Submission, shall be deemed acceptable Payees.
>
> * * * *
>
> Provider certifies by such acceptance [of funds] that Provider presented the claims for the services . . . and that the services were

rendered by or under the supervision of Provider. Provider understands that payment will be from federal and state funds and that any falsification, or concealment of a material fact, may be prosecuted under federal and state laws.

Georgia Department of Community Health Electronic Funds Transfer Agreement.

48.    At all times relevant to the Complaint, in order to receive payment for Medicaid services, a provider of occupational or physical therapy services, such as MGFR, must first enroll in the Georgia Medicaid program and enter into a provider agreement with the State called a "Statement of Participation."    Among the express understandings in the Statement of Participation include the following:

> Provider shall comply with all of the Department's requirements applicable to the category(ies) of service in which Provider participates under this Statement of Participation, including Part I, Part II, and the applicable Part III manuals.

> * * * *

> Claims Submissions: Certification of Claims. Provider shall submit claims for Covered Services rendered to eligible Medicaid recipients in the form and format designated by the Department. For each claim submitted by or on behalf of Provider, Provider shall certify each claim for truth, accuracy and completeness . . . .

> * * * *

> Provider shall maintain in an orderly manner and ensure the confidentiality of all original source documents, medical records, identifying recipient data, and any copies thereof, as may be necessary to fully substantiate the nature and extent of all services provided.

> * * * *

> Provider shall render Covered Services, as defined in the Department's Policies and Procedures manuals, to eligible Medicaid recipients that are medically necessary as defined by the Department, within the parameters permitted by Provider's license or certification, and within the category(ies) of services indicated in the Provider Enrollment documents. By submitting claims for

> reimbursement, Provider certifies that Covered Services were rendered in the amount, duration, scope and frequency indicated on the claims.
>
> * * * *
>
> Payment shall be made in conformity with the provisions of the Medicaid program, applicable federal and state laws, rules and regulations promulgated by the U.S. Department of Health and Human Services and the State of Georgia, and the Department's Policies and Procedures manuals in effect on the date the service was rendered. . . . Provider agrees that the Department shall not reimburse any claim, or portion thereof, for services rendered . . . for which federal financial participation is not available.
>
> * * * *
>
> Provider acknowledges that payment of claims submitted by or on behalf of Provider will be from federal and state funds, and the Department may withhold, recoup, or recover payments as a result of Provider's failure to abide by the Department's requirements.

Department of Community Health Division of Medical Assistance, Statement of Participation, DMA-002 (Rev. 04/03).

49.    Therefore, Defendants understood that Georgia Medicaid may withhold payment for claims submitted in violation of the Policies and Procedures manuals, incomplete or untruthful claims, unsubstantiated claims, inaccurate claims, claims submitted in violation of law, and claims submitted for which federal financial participation is not available.

50.    The Part I Medicaid/PeachCare for Kids Manual is applicable to all providers enrolled in the Georgia Medicaid program. In addition, such providers are also bound by the terms of the Part II Manual that are applicable to the services provided.

51.    The Part I Manual, "[a]long with the Statement of Participation, . . . encompasses the terms and conditions for receipt of reimbursement." Georgia Department of Community Health (DCH), Part I Policies and Procedures for Medicaid/PeachCare for Kids, at "Preface" (April 1,

2013). The Part I Manual reiterates and reemphasizes the importance the State of Georgia places

on compliance and further delineates the specific conditions placed on providers submitting

claims. For example, according to the Part I Manual, each enrolled provider must:

> Comply with all State and Federal laws and regulations related to furnishing Medicaid/PeachCare for Kids services.
>
> * * * *
>
> Not engage in any act or omission that constitutes or results in over utilization of services.
>
> * * * *
>
> Neither bill the Division for any services not performed or delivered in  accordance with all applicable policies . . . .
>
> * * * *
>
> Bill the Division for only those covered services that are medically necessary and within accepted professional standards of practice.

*Id.* at R. 106, p. I-18-19.

52.     At all times relevant to the Complaint, Defendant MGFR was subject to the conditions

set out in the DCH Part I Manual and all applicable terms in the Part II Manual.

### D. Georgia Statutes and Medicaid Policies for Occupational Therapy and Physical Therapy Services

53.     The Georgia State Occupational Therapy Licensing Act prohibits practicing occupational

therapy or holding oneself out as an occupational therapist or occupational therapy assistant

without a license.  *See* O.C.G.A. § 43-28-8.

54.     O.C.G.A. § 43-28-3(5) defines "occupational therapy" as including, but not limited to:

> (A)  Evaluation and treatment of individuals whose abilities to cope with the tasks of living are threatened or impaired by developmental deficiencies, the aging process, learning disabilities, poverty and cultural differences, physical injury or disease, psychological and social disabilities, or anticipated dysfunction.

17

The treatment utilizes task oriented activities to prevent or correct physical, cognitive, or emotional deficiencies or to minimize the disabling effect of these deficiencies in the life of the individual;

(B) Such evaluation techniques as assessment of sensory motor abilities, assessment of the development of self-care activities and capacity for independence, assessment of the physical capacity for prevocational and work tasks, assessment of play and leisure performance, and appraisal of living areas for persons with disabilities; and

(C) Specific occupational therapy techniques, such as activity analysis, activities of daily living skills, the fabrication and application of splints and adaptive devices, sensory motor activities, the use of specifically designed manual and creative activities, guidance in the selection and use of adaptive equipment, specific exercises and physical agent modalities to enhance physical functional performance, work capacities, and treatment techniques for physical capabilities and cognitive retraining. Such techniques are applied in the treatment of individual patients or clients, in groups, or through social systems.

55. The Georgia Physical Therapy Act prohibits practicing physical therapy or holding oneself out as a physical therapist or physical therapy assistant without a license. *See* O.C.G.A. §§ 43-33-11 and 43-33-12.

56. O.C.G.A. § 43-33-3 defines "physical therapy" as including, but not limited to:

(A) Examining, evaluating, and testing patients and clients with mechanical, physiological, and developmental impairments, activity limitations, participation restrictions, and disabilities or other movement related conditions in order to determine a physical therapy diagnosis, prognosis, and plan of intervention and to assess the ongoing effects of intervention;

(B) Alleviating impairments of body structure or function by designing, implementing, and modifying interventions to improve activity limitations or participation restrictions for the purpose of preventing or reducing the incidence and severity of physical disability, bodily malfunction, and pain;

(C) Reducing the risk of injury, impairment, activity limitations, participation restrictions, and disability, including the promotion and maintenance of health, fitness, and wellness in populations of

all ages;

(D) Planning, administering, evaluating, and modifying intervention and instruction, including the use of physical measures, activities, and devices, including but not limited to dry needling for preventative and therapeutic purposes; and

(E) Engaging in administration, consultation, education, teaching, research, telehealth, and the provision of instructional, consultative, educational, and other advisory services.

57.     Georgia law also prohibits the use of physical agent modalities by any person who has not obtained a specific physical agent modality license.  *See* O.C.G.A. § 43-28-8.1.

58.     Georgia Medicaid, which reimburses for medically necessary occupational and/or physical therapy services provided to Medicaid-eligible children as part of the Children's Intervention Services Program, applies even more stringent requirements for occupational and physical therapy providers participating in its programs.

59.     In order to receive reimbursement from Medicaid, the services must be provided by "qualified providers," which are those "currently licensed in the State of Georgia as . . . occupational therapists [and] physical therapists."  Therefore, occupational therapy assistants ("OTAs") and physical therapy assistants ("PTAs") may not provide services to Medicaid-eligible children.  DCH, Part II Policies and Procedures for Children's Intervention Services Program, at R. 601 (April 1, 2018).

60.     Further, in a group practice, hospital, or agency, the Part II Manual requires "each provider [to] enroll separately and bill for services directly provided under their own provider number."  The Part II Manual specifically prohibits "[i]ndiscriminate billing under one provider's name or provider number without regard to the specific circumstances of rendition of the services," and states that such indiscriminate billing "will be grounds for adverse action."  *Id.* at R. 602.

61.     The Medicaid Manual also requires all occupational therapy and physical therapy

providers enrolled in the Children's Intervention Services Program category of service to:

> Bill the Division the procedure code(s) which best describes the
> level and complexity of service rendered.

> \* \* \* \*

> Maintain written documentation of all services provided to
> members for a minimum of five (5) years after the date of service.

*Id.* at R. 603.7 and 603.9.

62.     Further, the Medicaid Manual expressly states that the following services are not covered

by Georgia Medicaid:

> Services which are provided in a manner which is non-compliant
> or inconsistent with the provisions of this [M]anual.

> \* \* \* \*

> Services provided by individuals other than the enrolled licensed
> practitioner of the healing arts.  Note:  OTA, PTA, Students, etc.
> are not allowed to provide services under the CIS Program.

> \* \* \* \*

> Group therapy.

*Id.* at R. 904.

### E. TRICARE

63.     TRICARE, formerly known as the Civilian Health and Medical Program of the

Uniformed Services ("CHAMPUS"), is a health care program of the United States Department of

Defense Military Health System. TRICARE provides civilian health benefits for military

personnel, military retirees, and their dependents, including some members of the Reserve

Component. TRICARE is managed by the TRICARE Management Activity under the authority

of the Assistant Secretary of Defense and is funded by the federal government.

### F. TRICARE Regulations for Occupational Therapy and Physical Therapy Services

64. TRICARE covers services of a CHAMPUS-authorized physical therapist or occupational therapist when:

> (A)  The services are prescribed and monitored by a physician, certified physician assistant or certified nurse practitioner.

> (B)  The purpose of the prescription is to reduce the disabling effects of an illness, injury, or neuromuscular disorder; and

> (C)  The prescribed treatment increases, stabilizes, or slows the deterioration of the beneficiary's ability to perform specified purposeful activity in the manner, or within the range considered normal, for a human being.

32 C.F.R. 199.4(c)(3)(x).

65. As of the date of this Complaint, TRICARE does not cover services provided by OTAs and PTAs since they are not listed as CHAMPUS-authorized providers in 32 C.F.R. § 199.6. While the National Defense Authorization Act for Fiscal Year 2018 directs the United States Department of Defense to revise 32 C.F.R. § 199.6 to authorize licensed or certified OTAs and PTAs, who meet the criteria under 42 C.F.R. § 484.4, to furnish services to TRICARE patients under the supervision of a licensed physical or occupational therapist, this has not yet occurred. *See* Pub. Law 115-91 § 721, Dec. 12, 2017. Thus, up to and until the regulations are finalized, OTAs and PTAs are not CHAMPUS-authorized providers, and services provided by OTAs and PTAs are not reimbursable under TRICARE regulations.

## FACTUAL ALLEGATIONS

### A. Billing for Services Not Rendered

66. It is the practice of Defendants MGFR and Brenda Hicks to bill Government-funded healthcare programs for services that were not actually provided.

67. Defendant MGFR maintains a hard copy medical file for each patient containing copies

of materially relevant documents, such as the therapist's evaluation form, the patient intake form, and the referral from the physician.

68.     Defendant MGFR also uses an electronic medical records system with practice management software, called ClinicSource.  ClinicSource is used by Defendant MGFR for scheduling patients with an occupational and/or physical therapist, completing and maintaining the therapist's treatment notes, and billing insurance companies, including Government-funded healthcare programs, for occupational and physical therapy evaluations and services.

69.     Therapists employed by Defendant MGFR log in to ClinicSource using a unique username and password.

70.     Therapists employed by Defendant MGFR are responsible for setting up electronic medical records for their patients and for inputting their patients' names, diagnoses, and treatment goals, based on the individual patient's plan of care, into ClinicSource.

71.     With each patient treatment, the MGFR therapist enters into ClinicSource (1) the appropriate procedure code(s), unit(s) rendered, and duration to describe the services provided to the patient, completing the "Treatment" section of the electronic note; and (2) the appropriate CPT code(s), unit(s) rendered, location, start time, end time, duration, description, diagnosis code(s), area(s) of concern, short and long term goal(s) and how the services provided met such goal(s), whether assistance was provided and the level of assistance if so provided, the percentage of achievement towards the patient's goal(s), and the patient's plan of care, completing the "Progress Note" section of the electronic note.

72.     Defendants Brenda Hicks and MGFR implemented a strict policy requiring all therapists to input each patient's percentage of achievement towards each identified goal in order to demonstrate patient progress for reimbursement purposes.  This written policy was prominently

displayed on Defendant Brenda Hicks' office door.

73.     MGFR therapists input patient-specific treatment notes describing the type(s) of services provided at every patient encounter into a specifically-designated, free-text section of ClinicSource.

74.     Defendant MGFR uses the information in the therapists' treatment notes to submit claims to insurance companies, including Government-funded healthcare programs.

75.     Upon information and belief, Defendants MGFR and/or Brenda Hicks logged into patients' medical records in ClinicSource and manipulated the therapists' prior entries and treatment notes.

76.     By doing so, Defendant MGFR routinely billed for units of therapeutic activities using CPT code 97530 that were not actually provided.

77.     During a patient's initial visit to MGFR, it was Relator's standard practice to perform a comprehensive evaluation on the patient, which included physical manipulations, and review and set treatment goals, then defer to the patient as to whether he or she would like to receive occupational therapy services at that same visit.  Due to the thoroughness of the initial evaluation, most all patients decline to receive occupational therapy services during the initial visit.  Thus, it was Relator's standard practice to select a CPT code corresponding to an evaluation only when completing a patient's ClinicSource entry on the initial visit date.

78.     During his employment at MGFR, Relator noticed that his treatment notes and selected CPT codes in ClinicSource had been altered.  As a result of such alterations, Defendant MGFR billed Government-funded healthcare programs for occupational therapy services that Relator did not provide.

79.     By way of example is a screenshot, attached herein as Exhibit 3, of patient S.J.'s

ClinicSource treatment note for services purportedly provided by Relator at MGFR on May 1, 2018.

80.     Relator specifically documented the following in ClinicSource regarding the treatment he provided to patient S.J. on May 1, 2018:  "OT initial [e]valuation completed on this date.  See document[ation] for details[,] **eval only on this date**."  Exhibit 3 (emphasis added).  Leery of the alterations made to prior treatment notes he had authored, Relator clearly documented that he performed only an initial evaluation, and no therapeutic activities, on patient S.J. on May 1, 2018.

81.     When Relator later viewed patient S.J.'s electronic medical record in ClinicSource, Relator again noticed that his treatment notes and selected CPT codes had been altered; specifically, Relator had not selected the CPT code 97530 for four units of therapeutic activities since he did not provide those services to patient S.J. on May 1, 2018.  Instead, upon information and belief, Defendants MGFR and/or Brenda Hicks logged into patient S.J.'s medical record in ClinicSource and fraudulently added four units of CPT Code 97530 in order to bill for therapeutic activities, which were not provided.

82.     As a result, Defendant MGFR billed a total of 90 minutes of treatment for patient S.J. on May 1, 2018 – 30 minutes of evaluation and 60 minutes of therapeutic activities.

83.     A screenshot of Relator's patient schedule for May 1, 2018, attached herein as Exhibit 4, demonstrates Relator was scheduled to spend up to 60 minutes conducting an evaluation with patient S.J. from 11:00 to 12:00.

84.     A screenshot of Relator's handwritten time log for May 1, 2018, attached herein as Exhibit 7, demonstrates Relator spent only 30 minutes evaluating patient S.J. from 11:00 to 11:30.

85. Upon information and belief, patient S.J. is a TRICARE beneficiary.

86. Defendants knowingly and fraudulently billed TRICARE for four units (60 minutes) of therapeutic activities (CPT Code 97530) for patient S.J., which Relator did not actually provide, on May 1, 2018.

87. By way of further example is a screenshot, attached herein as Exhibit 2, of patient A.D.'s ClinicSource treatment note for services purportedly provided by Relator at MGFR on April 3, 2018.

88. Relator specifically documented the following in ClinicSource regarding the treatment he provided to patient A.D. on April 3, 2018: "Initial [o]ccupational therapy [e]valuation [c]ompleted. See [d]ocumentation for details" and "Initial OT [Plan of Care]." Exhibit 2. In addition, the fields detailing whether assistance was provided during any purported activity (and the level of assistance if so provided) as well as the percentage of achievement towards the patient's goals was not completed in the treatment note, which is inconsistent with Relator's standard practice and Defendants' strict policy to complete these fields. Leery of the alterations made to prior treatment notes he had authored, Relator clearly documented that he performed only an initial evaluation, and no therapeutic activities, on patient A.D. on April 3, 2018.

89. When Relator later viewed patient A.D.'s electronic medical record in ClinicSource, Relator again noticed that his treatment notes and selected CPT codes had been altered; specifically, Relator had not selected the CPT code 97530 for six units of therapeutic activities since he did not provide those services to patient A.D. on April 3, 2018. Instead, upon information and belief, Defendants MGFR and/or Brenda Hicks logged into patient A.D.'s medical record in ClinicSource and fraudulently added six units of CPT Code 97530 in order to bill for therapeutic activities, which were not provided.

90.     As a result, Defendant MGFR billed a total of 120 minutes of treatment for patient A.D. on April 3, 2018 – 30 minutes of evaluation and 90 minutes of therapeutic activities.

91.     A screenshot of claims submitted by Defendant MGFR, attached herein as Exhibit 1, demonstrates Defendant MGFR billed 120 minutes of CPT Code 97530 for therapeutic activities allegedly provided by Relator to patient A.D. on April 3, 2018.

92.     Upon information and belief, patient A.D. is a TRICARE patient.

93.     Defendants knowingly and fraudulently billed TRICARE for six units (90 minutes) of therapeutic activities (CPT Code 97530) for patient A.D., which Relator did not actually provide, on April 3, 2018.

94.     By way of further example is a screenshot, attached herein as Exhibit 6, of patient M.J.'s ClinicSource treatment note for services purportedly provided by Relator at MGFR on April 19, 2018.

95.     Relator specifically documented the following in ClinicSource regarding the treatment he provided to patient M.J. on April 19, 2018:   "OT initial [e]valuation completed. See documentation for details" and "Initiate [Plan of Care]."   Exhibit 6.   In addition, the fields detailing whether assistance was provided during any purported activity (and the level of assistance if so provided) as well as the percentage of achievement towards the patient's goals was not completed in the treatment note, which is inconsistent with Relator's standard practice and Defendants' strict policy to complete these fields.   Leery of the alterations made to prior treatment notes he had authored, Relator clearly documented that he performed only an initial evaluation, and no therapeutic activities, on patient M.J. on April 19, 2018.

96.     When Relator later viewed patient M.J.'s electronic medical record in ClinicSource, Relator again noticed that his treatment notes and selected CPT codes had been altered;

specifically, Relator had not selected the CPT code 97530 for four units of therapeutic activities since he did not provide those services to patient M.J. on April 19, 2018. Instead, upon information and belief, Defendants MGFR and/or Brenda Hicks logged into patient M.J.'s medical record in ClinicSource and fraudulently added four units of CPT Code 97530 in order to bill for therapeutic activities, which were not provided.

97.     As a result, Defendant MGFR billed a total of 90 minutes of treatment for patient M.J. on April 19, 2018 – 30 minutes of evaluation and 60 minutes of therapeutic activities.

98.     A screenshot of Relator's patient schedule for April 19, 2018, attached herein as Exhibit 5, demonstrates Relator was scheduled to spend up to 60 minutes conducting an evaluation with patient M.J. from 4:30 to 5:30, up to 30 minutes providing occupational therapy services to patient V.M. from 5:00 to 5:30, and up to 60 minutes providing occupational therapy treatment to patient A.M. from 5:30 to 6:30. Thus, Relator's schedule demonstrates he treated other patients during the time therapeutic activities were billed for patient M.J. on April 19, 2018.

99.     Upon information and belief, patient M.J. is a TRICARE patient.

100.     Defendants knowingly and fraudulently billed TRICARE for four units (60 minutes) of therapeutic activities (CPT Code 97530) for patient M.J., which Relator did not actually provide, on April 19, 2018.

101.     As further example of Defendants' fraudulent practices to bill Government-funded healthcare programs for units of therapeutic activities not actually provided, Defendant Brenda Hicks threatened to, and ultimately did, deduct from a physical therapy assistant's paycheck the reimbursement difference received by MGFR between the 30 minutes of therapeutic activities the physical therapy assistant provided to a patient and the 60 minutes of therapeutic activities Defendant Hicks demanded the noncompliant physical therapy assistant bill.

### B. *Upcoding Occupational Therapy Services Provided*

102.   It is the practice of Defendants MGFR and Brenda Hicks to upcode claims submitted to Government-funded healthcare programs.

103.   In order to receive reimbursement for claims, Defendant MGFR must identify the services for which reimbursement is sought using standard, uniform code numbers as set out in the Healthcare Common Procedure Coding System ("HCPCS"). The HCPCS provides standardized coding to describe the specific items and services provided in the delivery of health care. Level I of the HCPCS is comprised of Current Procedural Terminology ("CPT") codes, a numeric coding system maintained by the American Medical Association ("AMA"), which is used primarily to identify medical services and procedures furnished by physicians and other healthcare professionals. Defendant MGFR is responsible for selecting the CPT codes that most accurately describe the services performed when submitting claims to Government-funded healthcare programs.

104.   Government-funded healthcare programs determine the reimbursement amount for each CPT code.

105.   For example, in April 2018, Georgia Medicaid reimbursed enrolled providers $28.23 for each unit of therapeutic activity billed with CPT code 97530.

106.   In comparison, Georgia Medicaid reimbursed enrolled providers less for other occupational therapy services, such as, for example, $24.18 for each unit of manual therapy technique billed with CPT code 97140 and $24.46 for each unit of sensory technique billed with CPT code 97533.

107.   Defendant Brenda Hicks instructed occupational therapists to select CPT code 97530 for services provided to Defendant MGFR's patients even when the actual services provided were

more accurately described using other, less lucrative CPT codes.

108.    Defendant Brenda Hicks specifically told Relator: "You probably never had this experience, but we don't bill for different things; we only bill therapeutic activity" and "[t[here are other employees complaining about the billing system – I'm here to tell you there is one code, therapeutic activity."

109.    Defendant Brenda Hicks explained that "front desk billers," not the therapists providing the services, determined what was billed and that Defendant MGFR may not get paid if the services were not billed under CPT Code 97530.

110.    Defendant MGFR routinely engaged in "upcoding" by knowingly submitting false claims for more expensive services than the services MGFR's therapists actually provided and documented.

111.    By upcoding these claims, Defendant MGFR knowingly obtained and retained higher reimbursements from Government-funded healthcare programs to which Defendant MGFR was not entitled.

### C. Billing for Occupational Therapy Services Provided by Unlicensed Staff

112.    It is the practice of Defendant MGFR to submit claims for services provided by unlicensed staff.

113.    Defendant MGFR accepted all patients, including walk-in patients, regardless of the clinic's busyness or the availability of its therapists because, according to the words Defendant Brenda Hicks told Relator: "We all gotta eat."

114.    As a result, Defendant MGFR's unlicensed front desk and billing employees, at times, provided services to patients in violation of Georgia law; as an example, Relator witnessed MGFR's unlicensed front desk and billing employees "treat" an autistic child as part of a puzzle

exercise and provide ultrasound therapy to an uninformed patient.

115.    Defendant MGFR knowingly submitted false claims for services provided by unlicensed staff to Government-funded healthcare programs using the National Provider Identifier ("NPI") of an appropriately licensed provider, misrepresenting and concealing who actually provided the services.

116.    Georgia law requires occupational therapists and occupational therapy assistants to obtain specific licensure for therapy techniques involving physical agent modalities, such as therapeutic ultrasound, cryotherapy, and transcutaneous electrical nerve stimulation ("TENS").

117.    Many employees of Defendant MGFR, including Defendant Brenda Hicks, performed therapy services involving physical agent modalities without having the state-required licensure to do so.

118.    Defendant MGFR knowingly submitted false claims to Government-funded healthcare programs for therapy services involving physical agent modalities performed by unlicensed personnel.

119.    Further, Defendant MGFR routinely misrepresented on the claim form submitted to Government-funded healthcare programs the identity of the person providing the therapeutic services and/or the services actually provided.

### D.  Improper Billing for Occupational Therapy Services Provided by Occupational Therapy Assistants

120.    It is the practice of Defendant MGFR to improperly bill Government-funded healthcare programs for services provided by occupational therapy assistants.

121.    Medicare regulations require direct supervision of occupational therapy assistants for services rendered to Medicare beneficiaries.

122.    Medicaid policies prohibit occupational therapy assistants from providing services to

Medicaid beneficiaries as part of the Children's Intervention Services Program.

123. TRICARE similarly does not reimburse for services provided by occupational therapy assistants to TRICARE beneficiaries.

124. Relator was the only occupational therapist on staff at Defendant MGFR.

125. Relator worked exclusively in Defendant MGFR's Macon office on Mondays and Wednesdays.

126. Relator worked exclusively in Defendant MGFR's Byron office on Tuesdays and Thursdays.

127. During Relator's employment with Defendant MGFR, one occupational therapy assistant worked solely in Defendant MGFR's Byron office, Monday through Friday, and provided therapeutic services to Government-funded healthcare program beneficiaries on Mondays, Wednesdays, and Fridays without the direct supervision of an occupational therapist.

128. Defendant MGFR knowingly and fraudulently submitted false claims to Medicaid and TRICARE for services provided to beneficiaries by an occupational therapy assistant in Defendant MGFR's Byron office. Defendant MGFR misrepresented the identity of the provider rendering the services by submitting claims to Medicaid and TRICARE that contained the NPI of an occupational therapist, who did not actually provide the services, instead of the appropriate NPI of the occupational therapy assistant.

129. Defendant MGFR knowingly and fraudulently submitted false claims to Medicare for services provided to beneficiaries by an occupational therapy assistant, without direct supervision, in Defendant MGFR's Byron office on Mondays, Wednesdays, and Fridays. Defendant MGFR misrepresented the identity of the provider rendering the services by submitting claims to Medicare that contained either (1) the NPI of an occupational therapist, who

did not actually provide or supervise the services, instead of the appropriate NPI of the occupational therapy assistant or (2) the NPI of the occupational therapy assistant, as if supervised by an occupational therapist.

### E. Improper Billing for Physical Therapy Services Provided by Physical Therapy Assistants

130. It is the practice of Defendant MGFR to improperly bill Government-funded healthcare programs for services provided by physical therapy assistants.

131. Medicare regulations require direct supervision of physical therapy assistants for services rendered to Medicare beneficiaries.

132. Medicaid policies prohibit physical therapy assistants from providing services to Medicaid beneficiaries as part of the Children's Intervention Services Program.

133. TRICARE similarly does not reimburse for services provided by physical therapy assistants to TRICARE beneficiaries.

134. During Relator's employment with Defendant MGFR, Defendant MGFR employed one physical therapist, who did not provide physical therapy services but performed evaluations only. Physical therapy services at Defendant MGFR were provided solely by physical therapy assistants.

135. Defendant MGFR's physical therapist was only onsite when performing an evaluation.

136. Defendant MGFR knowingly and fraudulently submitted false claims to Medicaid and TRICARE for services provided to beneficiaries by a physical therapy assistant. Defendant MGFR misrepresented the identity of the provider rendering the services by submitting claims to Medicaid and TRICARE that contained the NPI of a physical therapist, who did not actually provide the services, instead of the appropriate NPI of the physical therapy assistant.

137. Defendant MGFR knowingly and fraudulently submitted false claims to Medicare for

services provided to beneficiaries by a physical therapy assistant, without direct supervision. Defendant MGFR misrepresented the identity of the provider rendering the services by submitting claims to Medicare that contained either (1) the NPI of a physical therapist, who did not actually provide or supervise the services, instead of the appropriate NPI of the physical therapy assistant or (2) the NPI of the physical therapy assistant, as if supervised by a physical therapist.

**COUNT ONE**
**SCHEMES TO SUBMIT FRAUDULENT CLAIMS**
**31 U.S.C. § 3729 (a)(1)(A)**

138.    Relator Joshua Walthour incorporates and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

139.    As a result of the fraud schemes described above, Defendants, by and through their agents, offices, employees, and affiliates, knowingly presented, or caused to be presented, numerous false or fraudulent claims for payment or approval in violation of the FCA, 31 U.S.C. § 3729 (a)(1)(A).

140.    As set forth above, ill-gotten gains from the aforementioned presentation of false or fraudulent claims for payment or approval have been distributed to Defendant Brenda Hicks and Defendant Clarence Hicks.

141.    As a direct and proximate result of the false or fraudulent claims knowingly presented or caused to be presented by Defendants, the United States of America has suffered actual damages and is entitled to recover treble damages, plus a civil monetary penalty, for each false claim.

**COUNT TWO**
**SUBMISSION OF CLAIMS CONTAINING**
**FALSE EXPRESS OR IMPLIED CERTIFICATIONS**
**(31 U.S.C. § 3729(a)(1)(B))**

142.    Relator Joshua Walthour incorporates and realleges each allegation in each of the

preceding paragraphs as if fully set forth herein.

143.    By virtue of the acts alleged herein, Defendants knowingly made, used, or caused to be made or used, false records or statements—*i.e.*, false certifications and representations made or caused to be made by Defendants—material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

144.    By submitting claims for payment and retaining improperly obtained payments, Defendants expressly and impliedly, if falsely, certified their compliance with the relevant Government and CMS regulations authorizing such payments.

145.    As a direct and proximate result of the false or fraudulent claims knowingly presented or caused to be presented by Defendants, the United States of America has suffered actual damages and is entitled to recover treble damages, plus a civil monetary penalty, for each false claim.

**COUNT THREE**
**FALSE RECORDS FOR PAYMENT**
**(31 U.S.C. § 3729(a)(1)(B))**

146.    Relator Joshua Walthour incorporates and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

147.    Defendants submitted false records or statements to the Government representing that Defendants were entitled to payment and approval for therapy services rendered.  All such false records or statements were knowingly made and material to the Government to get false or fraudulent claims paid or approved by the Government.

148.    Defendants, thus, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

149.    As a direct and proximate result of the false or fraudulent claims knowingly presented or caused to be presented by Defendants, the United States of America has suffered actual damages

and is entitled to recover treble damages, plus a civil monetary penalty, for each false claim.

## COUNT FOUR
## FALSE CLAIMS CONSPIRACY
## (31 U.S.C. § 3729(a)(1)(C))

150.    Relator Joshua Walthour incorporates and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

151.    Defendants entered into a conspiracy or conspiracies through their employees and others to defraud the United States by submitting and obtaining approval and payment for false and fraudulent claims for the provision of therapy services.

152.    As a direct and proximate result of the false or fraudulent claims knowingly presented or caused to be presented by Defendants, the United States of America has suffered actual damages and is entitled to recover treble damages, plus a civil monetary penalty, for each false claim.

## COUNT FIVE
## GEORGIA FALSE MEDICAID CLAIMS ACT
## (O.C.G.A. §§ 49-4-168, *et seq.*)

153.    Relator Joshua Walthour incorporates and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

154.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia Medicaid Program for payment or approval.

155.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Georgia Medicaid Program to approve and pay such false and fraudulent claims.

156.    By virtue of the acts described herein, Defendants conspired to violate the Georgia FMCA and to defraud the Georgia Medicaid Program by getting a false or fraudulent claim allowed or paid.

157.     The Georgia Medicaid Program, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

158.     Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their obligations to return overpayments of Georgia state funds.

159.     As a direct and proximate result of the false or fraudulent claims knowingly presented or caused to be presented by Defendants, the State of Georgia has suffered actual damages and is entitled to recover treble damages, plus a civil monetary penalty, for each false claim.

## **PRAYER FOR RELIEF**

WHEREFORE, on each of these claims, Relator requests the following relief be ordered:

A.     Pursuant to 31 U.S.C. § 3729(a) and O.C.G.A. §49-4-168.1, Defendants pay an amount equal to three times the amount of damages the United States of America and the State of Georgia have sustained because of Defendants' actions, plus a civil penalty of $22,363 for each false or fraudulent claim or such other penalty as the law may permit and/or require for each violation of the FCA and Georgia FMCA;

B.     Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act, O.C.G.A. § 49-4-168.2 of the Georgia FMCA, and/or any other applicable provision of law;

C.     Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(d), O.C.G.A. § 49-4-168.2, and any other applicable provision of the law;

D.    Relator be awarded such other and further relief as the Court may deem to be just and proper;

E.    Defendants cease and desist from further violations of the FCA and Georgia FMCA as set forth above;

F.    Defendants be excluded from future participation in Government Programs;

G.    Plaintiffs be awarded pre- and post-judgment interest on the awards ordered herein; and

H.    Plaintiffs be granted a trial by jury.

Respectfully submitted this 10th day of October, 2018.

*/s/ Elizabeth S. White*

AIMEE J. HALL
Georgia Bar No. 318048
ELIZABETH S. WHITE
Georgia Bar No. 258844

POPE, MCGLAMRY, KILPATRICK,
MORRISON & NORWOOD, P.C.
3391 Peachtree Road, NE, Suite 300
P.O. Box 19337 (31226-1337)
Atlanta, GA  30326
(404) 523-7706
efile@pmkm.com

MICHAEL E. MAYO
Georgia Bar No. 940699

MAYO HILL
577 Mulberry Street, Suite 110
Macon, GA 31208
(478) 238-9898
mayo@mayohill.law

*Attorneys for Plaintiff-Relator*
