# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **JOSHUA WALTHOUR,** **STATE OF GEORGIA,** *ex rel.* **JOSHUA WALTHOUR** *Plaintiffs,* **v.** **MIDDLE GEORGIA FAMILY REHAB, LLC; BRENDA G. HICKS a/k/a BRENDA TAYLOR; and CLARENCE HICKS,** *Defendants.* | **CIVIL ACTION NO. 5:18-cv-00378-TES** |

## ORDER

On October 10, 2018, Relator Joshua Walthour filed this *qui tam* action against Defendants Middle Georgia Family Rehab, LLC ("MGFR"), Brenda G. Hicks, and Clarence Hicks, alleging violations of the False Claims Act, 31 U.S.C. §§ 3729–3733 (the "FCA"), and the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, *et seq.* (the "GFMCA"). *See generally* [Doc. 3].

Relator Walthour is a Georgia-licensed occupational therapist who worked at MGFR from February 2018 to May 2018, where he performed patient evaluations and provided occupational therapy services to patients. [*Id.* at ¶ 8]. Relator claims that during his employment, he witnessed Defendants engage in fraudulent business

practices against the Medicare, Medicaid, and TRICARE programs. [*Id.* at ¶¶ 8–13]. Such fraudulent practices include billing for occupational and physical therapy services not rendered, upcoding for services provided, and billing for services provided by unqualified personnel. [*Id.*].

Two and a half years later, on May 3, 2021, the United States of America and the State of Georgia (collectively, the "Government") intervened and filed a Complaint In Intervention (the "Complaint") [Doc. 31]. In its Complaint, the Government adopts and expounds upon many of Relator's original allegations of fraud. *See* [Doc. 31]. The Government claims that Defendants received millions of dollars in payments to which they were not entitled as a result of their fraudulent practices. [*Id.*].

## BACKGROUND

### A.   Procedural History

In October 2018, Relator initiated this action against Defendants following his short-lived, three-month employment at MGFR. *See* [Doc. 3]. Soon thereafter, the Government spent the next two-and-a-half years investigating Relator's allegations. [Doc. 29]. Based on its findings, the Government intervened and filed its Complaint, wherein it alleged that MGFR perpetrated three fraudulent schemes: (1) falsely reporting to government healthcare programs who was rendering services for reimbursement; (2) billing for services rendered by unauthorized providers; and (3) falsely billing for services that reimburse at a higher rate than the services actually

performed. [Doc. 31, ¶¶ 77–113; 114–28; 129–42]. The Government claims that

Defendants received payments they were not entitled to receive from Medicare,

Medicaid, and TRICARE in violation of the FCA and the GFMCA. *See generally* [*id.*].

Defendants filed an Answer [Doc. 34] denying any violation of federal or state law on

the ground that they did not *knowingly* submit (or cause to be submitted) false claims

for payment to government healthcare programs.

The Court entered a Scheduling and Discovery Order [Doc. 37] that set discovery

to expire March 22, 2022. But, because of some scheduling difficulties, the Court

allowed the Government to depose six witnesses after the discovery period expired.

[Doc. 51]. However, before deposing any of these witnesses, the Government moved for

partial summary judgment on 1,062 specific claims for payment submitted by

Defendants to government healthcare programs. *See* [Doc. 41]. The Government argues

that, with respect to these specific claims, "Defendants have admitted all of the

elements necessary to establish violations of the False Claims Act." [*Id.* at p. 1]. Since the

Government opted not to conduct any substantive discovery, it is left to rely exclusively

on its belief and contention that "MGFR made several significant—and dispositive—

admissions[]" in its Answer that establish "the elements necessary to conclude as a

matter of law that it has violated the FCA and [G]FMCA." [*Id.* at pp. 3, 12].

B.   **Admitted Facts**

The facts in this case are largely undisputed. MGFR is a healthcare organization that offers physical therapy, occupational therapy, and speech therapy services to adults and children. [Doc. 47-1, ¶ 1]. It has one location in Byron, Georgia, and a second location in Macon, Georgia. [*Id.* at ¶ 2]. Brenda Hicks founded MGFR and co-owns the organization with Clarence Hicks. [*Id.* at ¶¶ 3, 6]. The co-owners maintain different responsibilities when it comes to ensuring the overall operation of the organization. [*Id.* at ¶¶ 4–6]. Brenda Hicks oversees daily operations, which includes scheduling therapy services and billing for government healthcare programs. [*Id.* at ¶ 4]. Her responsibilities include submitting claims to the Medicare, Medicaid, and TRICARE programs. [*Id.* at ¶ 5]. Clarence Hicks assists with daily operations, including enrolling MGFR in government healthcare programs. [*Id.* at ¶ 7]. But, he has no involvement, including any supervisory role, in submitting claims to the aforementioned programs. [Doc. 47-3, ¶ 13].

Since MGFR first opened its doors, it has routinely submitted claims to the Medicare, Medicaid, and TRICARE programs. [Doc. 47-1, ¶ 8]. MGFR agreed that it would only submit claims that were accurate, complete, and truthful. [*Id.* at ¶ 9]. Through this agreement, MGFR certified that the information provided on each claim was accurate, complete, and truthful. [*Id.* at ¶ 10]. MGFR knew it was prohibited from misrepresenting the identity of the provider who rendered the services underlying a

4

specific claim. [*Id.* at ¶ 11]. In fact, the healthcare organization knew that providing

accurate information on a claim was a condition of payment. [*Id.* at ¶ 12]. And, it knew

that accurately representing the identity of the rendering provider was material to the

Government's reimbursement decisions. [*Id.* at ¶ 13].

Brenda Hicks and Clarence Hicks deny knowingly submitting (or causing to be

submitted) claims for payment to these programs that contained false information in

violation of federal and state laws. [Doc. 34, ¶ 4]; *see generally* [Doc. 47]. Since 2013,

Brenda Hicks has called the Medicare and TRICARE helplines to receive instructions on

how to submit claims for reimbursement. [Doc. 47-3, ¶ 2]. Brenda Hicks avers that

Medicare and TRICARE representatives told her that she could bill for services

rendered by physical therapy assistants and occupational therapy assistants *if* these

assistants were supervised by a licensed physical therapist or occupational therapist.

[*Id.* at ¶¶ 3, 5–9]. In these discussions, Brenda Hicks claims that representatives advised

her that the occupational therapist or physical therapist make onsite supervisory visits

every 30 days—the therapists were not required to be onsite when assistants rendered

the services. [*Id.*]. Brenda Hicks understood Medicaid to follow the same standards, and

therefore, relied on this information when submitting MGFR's claims for

reimbursement to Medicare, Medicaid, and TRICARE. [*Id.* at ¶ 4].

Moreover, a newly hired speech pathologist confirmed that supervisors need

only be onsite once a month to legally and properly bill for an assistant's services. [*Id.* at

¶¶ 10–11]. When MGFR hired Shakemia Johnson as a speech language pathologist in March 2015, she advised MGFR that her assistant could work and bill under her name for services that the assistant rendered. [*Id.*]. Shakemia confirmed that she did not need to directly supervise her assistant when the assistant rendered billable services. [*Id.*]. Brenda Hicks avers that Shakemia's statements matched the information that she gleaned from her conversations with government representatives, and she believed the information to be accurate. [*Id.* at ¶ 11].

The Government's pending Motion takes issue with allegedly false claims submitted by MGFR for services rendered by three therapists—Gamal Elawad, Maren Johnson, and Cassandra Frazier. *See generally* [Doc. 41]. MGFR hired Gamal Elawad as a licensed physical therapist, and he worked for the healthcare organization for several years, including 2016 and 2018. [Doc. 47-1, ¶ 20]. Relevant to this action is the fact that Elawad spent time in jail on the following dates: January 7–23, 2016; August 30–September 6, 2018; October 31–November 2, 2018; and November 29–December 6, 2018. [Doc. 47-1, ¶¶ 21–22]. MGFR submitted 59 claims[1] for reimbursement to government healthcare programs that listed Elawad as the rendering provider of services on dates when he was incarcerated. [*Id.* at ¶¶ 23, 26]; *see generally* [Doc. 41-5]; [Doc. 41-7].

---

[1] Defendants submitted 24 claims under the name and billing number of Gamal Elawad to TRICARE between January 7–23, 2016. [Doc. 41-3, ¶ 3]. Defendants submitted two claims under Elawad's name to Medicare between August 30–September 6, 2018, and four claims to Medicare between November 29–December 6, 2018. [*Id.* at ¶ 4]. Defendants submitted 29 claims under Elawad's name to Medicaid on September 4–5, 2018 and December 4–5, 2018. [Doc. 41-6, ¶ 5].

Obviously, since Elawad was in jail, he could not provide services on those dates; so, other MGFR employees did. [Doc. 47-1, ¶ 24]. However, MGFR's misrepresentations of Elawad as the rendering provider were material to the government healthcare programs' reimbursement decisions. [*Id.* at ¶ 25].

MGFR hired Cassandra Frazier as a licensed speech language pathologist, and she worked for the healthcare organization for several years, including 2015. [*Id.* at ¶ 27]. She resigned on November 10, 2015. [*Id.* at ¶ 30]. During Frazier's employment, she traveled outside the state of Georgia on the following dates: May 11–15, 2015; May 31–June 5, 2015; and October 12, 2015. [*Id.* at ¶ 28]. MGFR submitted claims for reimbursement to government healthcare programs that listed Frazier as the rendering provider for services on dates when she wasn't in Georgia. [*Id.* at ¶ 29]. Again, it is obvious that Frazier did not provide any services on those dates; so, other MGFR employees did. [*Id.* at ¶ 32]. Frazier resigned from MGFR on November 10, 2015. [*Id.* at ¶ 30]. But, even after this date, MGFR continued to submit claims listing her as the rendering provider. [*Id.* at ¶ 31]. MGFR submitted 1 claim to Medicare, 11 claims to Medicaid, and 29 claims to TRICARE that represented Frazier as the rendering provider of speech therapy services on dates after her resignation. [Doc. 41-3, p. 2]; *see generally* [Doc. 41-5]; [Doc. 41-7]. MGFR's misrepresentations of Frazier as the rendering provider were material to the government healthcare programs' reimbursement decisions. [Doc. 47-1, ¶ 33].

MGFR hired Maren Johnson as a licensed occupational therapist sometime in 2017. [*Id.* at ¶ 14]. She didn't work for MGFR after January 4, 2018. [*Id.* at ¶ 15]. But**,** MGFR continued submitting claims listing Maren Johnson as the rendering provider for services after her employment ended. [*Id.* at ¶ 16]. Specifically, MGFR submitted 100 claims to Medicaid and 667 claims to TRICARE. [Doc. 41-3, p. 2]. And, of course, Maren Johnson could not have rendered any services after January 4, 2018; so, other MGFR employees did. [Doc. 47-1, ¶ 17]. MGFR's misrepresentations of Maren Johnson as the rendering provider were material to the reimbursement decisions. [*Id.* at ¶ 18]. In total, MGFR submitted 767 claims to government healthcare programs under Maren Johnson's name after her employment ended. [*Id.* at ¶ 19].

Based on these facts (and the rather narrow scope of the pending Motion), the Government seeks summary judgment on its claim that MGFR, Brenda Hicks, and Clarence Hicks "presented, or caused to be presented, materially false and fraudulent claims for payment or approval to the United States, including claims for reimbursement by [Medicare, Medicaid, and TRICARE], that were false and fraudulent because, among other things, they were for services that were never rendered and/or they were for services that should not have been reimbursed[]" in violation of 31 U.S.C. § 3729(a)(1) and (a)(1)(A). [Doc. 31, ¶¶ 144–46]. Additionally, the Government seeks summary judgment on its claim that Defendants "made, used, or caused to be made or used, false records or statements . . . to obtain approval and payment by the United

States for false or fraudulent claims[]" in violation of 31 U.S.C. § 3729(a)(1)(B). [*Id.* at ¶¶ 149–52]. And lastly, based on the evidence establishing Defendants' knowing violations of the FCA, the Government moves for summary judgment as to its claim that Defendants "knowingly presented, or caused to be presented, materially false claims for payment[]" and "made, used, or caused to be made or used, false records or statements . . . to obtain payment by the Georgia Medicaid Program[]" in violation of the GFMCA. [*Id.* at ¶¶ 162–69].

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a

genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[2]

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for the purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more

---

[2] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

## DISCUSSION

The Government contends that MGFR "intentionally and systemically submitted claims for payment" under the names of three therapists—Gamal Elawad, Maren Johnson, and Cassandra Frazier—who MGFR "knew (or should have known) did not provide the services in question." [Doc. 41-1, pp. 1–2]. It argues that "[f]or those claims where MGFR has admitted that it knew the person on the claim was not the provider of the services being billed, all of the elements of a FCA claim have been established and summary judgment on those claims is appropriate." [*Id.* at pp. 6–7]. Defendants dispute this contention, focusing their brief in opposition on the Government's failure to establish the third element of an FCA claim—that Defendants *knowingly* submitted, or

11

caused to be submitted, claims for payment that were false and in violation of federal law. *See* [Doc. 47, pp. 5–10].

Relatedly, under the GFMCA, the Government alleges that Defendants "knowingly presented, or caused to be presented, materially false and fraudulent claims for payment or approval to the Georgia Medicaid Program" and "made, used or caused to be made or used, false records or statements . . . to obtain approval and payment by the Georgia Medicaid program." [Doc. 31, ¶¶ 163–69].

The Court sets out the elements to both claims below and examines them in respect to the arguments set forth in the parties' briefs and the limited facts in the record.

A.    <u>Relevant Legal Frameworks</u>

1.    **The FCA**

"The FCA is designed to protect the Government from fraud by imposing civil liability and penalties upon those who seek federal funds under false pretenses." *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 600 (11th Cir. 2014). It is not designed as a "a catchall anti-fraud provision; it only goes after claims that are false, not claims that are submitted while fraud is afoot." *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F.Supp.2d 25, 71 (D.D.C. 2007) (citation omitted). Accordingly, the FCA "does not create liability merely for [the] disregard of Government regulations or improper internal policies unless, as a result of such acts,

the provider knowingly asks the Government to pay amounts it does not owe." *United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)).

Relevant to this action, the FCA imposes civil liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval[]" and/or "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §§ 3729(a)(1)(A)–(B). "These claims are known respectively as presentment claims and use claims, and they have different elements." *United States v. Adams*, 317 F.Supp.3d 1195, 1209 (N.D. Ga. 2019) (citing *United States ex rel. Bibby v. Wells Fargo Bank, N.A.*, 906 F.Supp.2d 1288, 1298 (N.D. Ga. 2012)).

To establish a prima facie case for presentment claims under § 3729(a)(1)(A), the Government must prove three elements: (1) a false or fraudulent claim (2) which was presented, or caused to be presented, for payment or approval (3) with the knowledge that the claim was false. *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017) (citing 31 U.S.C. § 3729(a)(1)(A)). "[A] central question in [a presentment claim case] is whether the defendant ever presented a 'false or fraudulent claim' to the government." *Clausen*, 290 F.3d at 1311 (quoting *Harrison*, 176 F.3d at 785).

In contrast, to establish a prima facie case for use claims under § 3729(a)(1)(B), the Government need not prove that the defendant presented or caused to be presented

a false claim to the government. *Bibby*, 906 F.Supp.2d at 1298; *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009). Rather, the Government must prove the following elements: (1) that the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim. *Phalp*, 857 F.3d at 1154 (citing § 3729(a)(1)(B)).

### a.   Presentment

"The submission of a false claim is the '*sine qua non*' of a [FCA] violation." *United States v. Marder*, 208 F.Supp.3d 1296, 1312 (S.D. Fla. 2016) (citing *Clausen*, 208 F.Supp.3d at 1311). While "[t]he FCA does not define the metes and bounds of an individual's liability for causing the submission of false claims, . . . [c]ourts routinely apply traditional principles of tort law when evaluating causation under the FCA." *United States v. Smart Pharm. Inc.*, No. 3:14-CV-1453-J-39JBT, 2020 WL 10506311, at *6 (M.D. Fla. Dec. 1, 2020) (citation omitted). In applying such principles, courts need to consider whether "there is a sufficient nexus between the [d]efendant[']s conduct and the ultimate presentation of the allegedly false claim." *Marder*, 208 F.Supp.3d at 1312 (quoting *United States v. Abbot Lab'ys*, No. 3:06-CV-1769-M, 2016 WL 80000, at *6 (N.D. Tex. Jan. 7, 2016)).

### b.   Falsity

"There are two types of false or fraudulent claims that may be alleged by plaintiffs pursing presentment or []use claims under the False Claims Act: factually false

14

claims and legally false claims." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 116 F.Supp.3d 1326, 1344 (S.D. Fla. 2015), *aff'd* 857 F.3d 1148 (11th Cir. 2017). "[A]pplication of the [FCA] in factually false cases is 'fairly straightforward.'" *Id.* (quoting *United States v. Amin Radiology*, No. 5:10-CV-583-OC-PRL, 2015 WL 403221, at *3 (M.D. Fla. Jan. 28, 2015), *aff'd sub nom. U.S. ex rel. Fla. v. Amin Radiology*, 649 F. App'x 725 (11th Cir. 2016). "In the paradigmatic case, a claim is [factually] false because it involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *United States v. Crumb*, No. 15-0655-WS-N, 2016 WL 4480690, at *12 (S.D. Ala. Aug. 24, 2016) (quoting *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010)). "[A] claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *United States v. Space Coast Med. Assocs., LLP*, 94 F.Supp.3d 1250, 1259 (M.D. Fla. 2015).

In this action, the Government argues that the claims at issue are factually false because they misrepresent the identity of the provider who actually rendered therapy services. [Doc. 41-1, pp. 12–15]. It has long been accepted that claims submitted for reimbursement under the name of a provider who did not actually render the services constitute false claims. *See Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975);[3] *United*

---

[3] Because the Eleventh Circuit was previously a part of the Fifth Circuit, cases decided by the Fifth Circuit prior to October 1, 1981, are precedential to this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

*States v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001). Importantly, in this action, Defendants admit that all claims at issue were submitted under the names of therapists who did not actually render the services. [Doc. 41-1, ¶¶ 16–17, 23–24, 29–32]. Defendants do not address the Government's argument that their judicial admissions establish the falsity element for presentment and use claims. In opposing partial summary judgment, Defendants fail to address the falsity element at all.

Therefore, based on the relevant judicial admissions and caselaw, the Court concludes that the Government has established the falsity element as to all relevant claims at issue.

### b.    Materiality

"The falsity and materiality elements of an FCA claim are distinct and independent requirements." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1299 (11th Cir. 2021). "[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the FCA." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 178 (2016). The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* (quoting 31 U.S.C. § 3729(b)(4)). The Supreme Court has emphasized that the FCA's materiality standard is a "demanding" one to meet. *Universal Health Servs., Inc.* 579 U.S. at 178. While there is no "bright-line test for determining whether the FCA's materiality

16

requirement has been met[,]" there are various factors to consider. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1213 (9th Cir. 2019). Such factors include but are not limited to: (1) "whether the matter is an express condition to payment"; (2) "whether, to the extent the United States had actual knowledge of the misrepresentations, they had an effect on its behavior"; and (3) "whether the misrepresentations went to the essence of the bargain." *Yates*, 21 F.4th at 1300.

In this action, the Government claims that Defendants' misrepresentations of Gamal Elawad, Maren Johnson, and Cassandra Frazier as rendering providers were material to and a condition of Medicaid, Medicare, and TRICARE's reimbursement decisions. [Doc. 41-1, pp. 12, 14–15]. On this matter, it appears there is no dispute. Once again, Defendants' judicial admissions are particularly relevant. Defendants admit that MGFR's misrepresentations of Gamal Elawad, Maren Johnson, and Cassandra Frazier as rendering providers were material to and a condition of the government healthcare programs' reimbursement decisions. [Doc. 47-1, ¶¶ 13, 18, 25, 33]. In opposing partial summary judgment, Defendants do not even attempt to argue that the Government cannot prove materiality.

Therefore, based on the relevant judicial admissions and caselaw, the Court concludes that the Government has established the materiality element as to all relevant claims at issue.

*c.    Knowledge*

Under the FCA, the term "knowingly" means that a person, with respect to

information either (1) has actual knowledge of the information; (2) acts in deliberate

ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of

the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). None of these three

definitions "require proof of specific intent to defraud." *Id.* at (b)(1)(B). Rather, "[t]he

first [definition] of 'knowingly' goes after subjective knowledge, while the second seeks

out the kind of willful blindness from which subjective intent can be inferred." *United*

*States v. Sci. Applications Int'l Corp.*, 555 F.Supp.2d 40, 54 (D.D.C. 2008). The third

definition is an addition to the original text of the statute. In 1986, Congress added the

"reckless disregard" provision to the FCA "to ensure that 'knowingly' captured the

'ostrich' type situation where an individual has 'buried his head in the sand' and failed

to make simple inquiries which would alert him that false claims are being submitted."

*Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015) (quoting S. Rep. 99-

345, at 21, reprinted in 1986 U.S.C.C.A.N. 5266, 5286). "Reckless disregard is the lowest

scienter threshold under the FCA." *Yates*, 21 F.4th at 1303. It is "akin to an extension of

gross negligence or an extreme version of ordinary negligence." *Urquilla-Diaz*, 780 F.3d

at 1058. "So, a person acts with reckless disregard—and thus 'knowingly'—under the

FCA when he 'knows or has reason to know of facts that would lead a reasonable

18

person to realize that harm is the likely result of the relevant act.'" *Yates*, 21 F.4th at 1303 (quoting *Urquilla-Diaz*, 780 F.3d at 1058).

Based on the briefing, this element appears to be the only one in dispute. Accordingly, since the Court has already determined that Defendants' admissions establish the elements of falsity and materiality, the remainder of the analysis focuses on whether the knowledge element has been established.

### 2.    The GFMCA

Before presenting its analysis on the knowledge element, the Court must first address another statutory framework. In addition to bringing its allegations of fraud under the FCA, the Government also brings these allegations under the GFMCA. "[T]he Georgia Court of Appeals has noted that "[t]he statutory language in the GFMCA . . . mirrors the language in the [FCA]." *United States v. Genesis Glob. Healthcare*, No. 4:180-cv-128, 2021 WL 4268279, at *3 (S.D. Ga. Sept. 20, 2021) (quoting *Hill v. Bd. of Regents of the Univ. Sys. of Ga.*, 829 S.E.2d 193, 198 (Ga. Ct. App. 2019)). Not surprisingly then, the GFMCA imposes liability on any person who (1) "knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval"; or (2) "knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." O.C.G.A. § 49-4-168.1 (a)(1)–(2). Since the GFMCA follows the wording of the FCA so closely, the one analysis will thoroughly address claims under both federal and state statutes.

B.      **Analysis: Did Defendants** *Knowingly* **Submit False Claims?**

As noted earlier, the scope of the Government's pending Motion is narrow. It only seeks summary judgment as to those claims that MGFR submitted to government healthcare programs under the names and billing numbers of: (1) Gamal Elawad during the dates he was incarcerated; (2) Maren Johnson after January 4, 2018; and (3) Cassandra Frazier during the dates she was physically outside the state of Georgia and retired from MGFR. *See* [Doc. 41-1]. Given the relatively bare record, the Government relies exclusively on those admissions set forth in Defendants' Answer to support summary judgment. *See* [*id.* at p. 3].

As to its presentment claims, the Government argues that Defendants admitted to *presenting* claims to government healthcare programs for reimbursement that were *factually false* (because the claims misrepresented who actually provided therapy services) with the *knowledge* that such claims contained this false information. And, as to its use claims, the Government argues that Defendants admitted to *making, using, or causing to be made or used*, false statements with the *knowledge* that accurately representing the identities of the rendering providers was *material* to the government healthcare programs' reimbursement decisions. *See* [*id.*].

In response, Defendants dispute that they *knowingly* presented claims for payment to the Government that were false. The sole focus of their opposition to partial summary judgment focuses on the FCA's scienter requirement. Defendants argue that

20

partial summary judgment should be denied because a genuine issue of material fact

remains as to whether they *knowingly* presented a false claim for reimbursement and

*knowingly* made/used a false statement material to a claim for reimbursement. *See* [Doc.

47]. If the Government fails to show that Defendants acted with the requisite scienter—

knowledge—then the Government fails to establish liability under the FCA. *See Yates*,

21 F.4th at 1302 ("Liability under the FCA arises only when a defendant acted

"knowingly."). The Court addresses whether the Government has established knowing

submissions of false claims under the names of Gamal Elawad, Maren Johnson, and

Cassandra Frazier. However, the Court finds that this analysis is different for

Defendant Clarence Hicks than it is for Defendants Brenda Hicks and MGFR. So, the

Court addresses this difference first.

### 1.    Defendant Clarence Hicks

The Government seeks to establish Clarence Hicks' knowing violations of the

FCA and GFMCA based on his 50% co-ownership of MGFR and his responsibilities

with the daily operations of the business. The Government takes interest in one

particular area of responsibility: Clarence Hicks enrolled MGFR in the Medicaid,

Medicare, and TRICARE programs. By enrolling MGFR in these programs, Clarence

Hicks certified that MGFR would submit claims that were accurate, complete, and

truthful. The Government contends that this certification (in addition to his co-

ownership) is sufficient evidence to establish that Clarence Hicks *knowingly* caused false

claims to be submitted to government healthcare programs.

The Court sees it differently. While it is true that a person need not be the one

who actually submitted the claim forms in order to be liable, there still needs to be a

"sufficient nexus between the [person's] conduct and the ultimate presentation of the

allegedly false claim[]" to establish liability under the FCA. *Marder*, 208 F.Supp.3d at

1312. Under this analysis,

> a defendants' conduct may be found to have caused the submission of a
> claim for Medicare reimbursement if the conduct was (1) a substantial
> factor in inducing providers to submit claims for reimbursement, and (2) if
> the submission of claims for reimbursement was reasonably foreseeable or
> anticipated as a natural consequence of [d]efendants' conduct.

*Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1107 (11th Cir. 2020) (quoting *Marder*, 208

F.Supp.3d at 1312–13). Contrary to the Government's assertions, the Court cannot

definitively conclude, as a matter of law, that Clarence Hicks' ownership interest in

MGFR makes him personally responsible for all claims that MGFR submitted to

government healthcare programs. The record clearly reflects that Brenda Hicks took

sole responsibility for all claims submitted for reimbursement. In response, the

Government simply doubles down on its argument that as a co-owner, Clarence Hicks

is responsible.

While it cannot be said that Clarence Hicks "had no involvement with [the]

claims [at issue]"—given that he enrolled MGFR in these government healthcare

programs—the Court cannot conclude, based on the current record and by drawing all reasonable inferences in the non-movant's favor, that the Government has proven as a matter of law that Clarence Hicks knowingly submitted any claims at issue.[4] Therefore, the Court DENIES partial summary judgment as to Clarence Hicks.

The remainder of the analysis focuses only on Defendants Brenda Hicks and MGFR.

### 2.    Defendants Brenda Hicks and MGFR

#### a.    *Claims Submitted Under Gamal Elawad*

Fifty-nine claims were submitted to government healthcare programs listing Gamal Elawad as the rendering provider of therapy services on dates he was incarcerated. MGFR makes two critical admissions. One, that it submitted claims under Elawad's name during his incarceration when the billed services were rendered by physical therapist assistants—not by Elawad. And two, that it admitted these claims misrepresented Gamal Elawad as the rendering provider, which was information material to and a condition of the government healthcare programs' reimbursement decisions. The Government contends that these admissions clearly show that Brenda Hicks and MGFR *knew* the information presented to these programs was false. But, there is a difference between admitting that claims submitted to the Government

---

[4] Perhaps the Government will have something to rebut Brenda Hicks' affidavit if and when it deposes Clarence Hicks and the other witnesses it insisted on deposing after the initial discovery period expired.

contained false information and admitting to *knowingly* submitting false claims to the Government. While Brenda Hicks and MGFR acknowledge and concede that the statements at issue may have contained materially false information (such as the name of the provider actually rendering services) they nonetheless contend that they were simply following the telephonic guidance from Government representatives from Medicare, Medicaid, and TRICARE, so that they didn't know they were violating any laws.

Since MGFR first opened its doors in 2013,[5] Brenda Hicks relied on the Medicare and TRICARE helplines to obtain guidance on how to submit claims for reimbursement. Brenda Hicks avers that representatives from both government programs informed her that she could bill under the names of supervising occupational or physical therapists for services rendered by physical therapy assistants and occupational therapist assistants. According to her, those representatives instructed her that occupational and physical therapists need only make onsite supervisory visits every 30 days in order for her to submit claims under their names. In addition, Brenda Hicks says that she relied on Shakemia Johnson's (a speech language pathologist)

---

[5] The Court gives no credence to those phone calls that Brenda Hicks allegedly made to Medicare and TRICARE representatives on or about November 17, 2020. *See* [Doc. 47-3, ¶¶ 5–7]. These phone calls occurred long after Brenda Hicks knew that the Government was investigating her for fraudulent business practices. [*Id.*]. These calls, therefore, cannot be relevant to whether she *knowingly* submitted the false claims at issue.

statement that her assistants could work and bill under her name without her needing to supervise the assistants onsite.

Brenda Hicks states[6] that she relied on the information provided by Medicare and TRICARE when submitting claims under Gamal Elawad's names for services rendered on dates he was incarcerated. Defendants claim that "those periods of incarceration did not prevent . . . Elawad from being able to supervise the work of his physical therapy assistants every thirty (30) days." [Doc. 47, p. 3]. Thus, Brenda Hicks argues that she believed that because "Elawad's incarceration did not prevent him from supervising his physical therapy assistants consistent with the advice and direction [Brenda Hicks] and MGFR received from Medicare and TRICARE[,]" she could still list him as the rendering service provider on claims submitted to government healthcare programs during his incarceration.

While this may seem like a far-fetched and conveniently self-serving response, the Court doesn't get to make those kinds of assessments at the summary-judgment stage. *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1162 (11th Cir. 2012) ("Where a fact-finder is required to weigh a deponent's credibility, summary judgment is simply

---

[6] The Government seeks to exclude Brenda Hicks' Declaration on the ground that it "is not admissible in evidence because it is replete with inadmissible hearsay." [Doc. 49, p. 7]. To be specific, the Government takes issue with Brenda Hicks testifying as to what someone else—Medicare and TRICARE representatives—told her during a phone conversation. As to this point, "[i]f out-of-court statements are introduced to show their effect on the listener, rather than to prove the truth of the matter stated, they are not hearsay." *Wood v. City of Warner Robins*, No. 5:19-cv-00319-TES, 2022 WL 987991, at *7 n.10 (M.D. Ga. Mar. 31, 2022) (citing Fed. R. Evid. 801(c)); *see United States v. Harris*, 886 F.3d 1120, 1129–30 (11th Cir. 2018).

improper."). The Court concludes that Brenda Hicks' averment that she submitted claims under the instruction that she could name Elawad as the rendering provider, even though he did not provide the services, precludes summary judgment. In an action such as this, "[r]elators [or the Government] must point to facts that show that [d]efendants knew or should have known that [their] practices rendered the claims they submitted false." *Phalp*, 116 F.Supp.3d at 1360. Here, the Government points to such a practice—billing under the name of a therapist for services rendered by the assistant, but then fails to show that Brenda Hicks and MGFR *knew* that their practices led to the submission of false claims.

This is not the "'ostrich type' situation where [Brenda Hicks or MGFR] buried [their] head[s] in the sand and failed to make simple inquires which would alert [them] that false claims [were] being submitted." *Urquilla-Diaz*, 780 F.3d at 1058 (citation omitted). Accepting the unrebutted evidence at face value and drawing all reasonable inferences against the Government, as the Court must, the record shows that Brenda Hicks regularly sought guidance from the Medicare and TRICARE programs on how to properly comply with its regulations, and she was advised to submit the claims in the manner in which she did. Thus, with deference to the applicable standard for summary judgment, the Court cannot accept the Government's contention that she has admitted that she acted with actual knowledge or reckless disregard as to those claims submitted under Elawad's name. A jury gets to decide whether they believe Brenda Hicks or not.

In doing so, they will necessarily have to decide matters of credibility given that Brenda Hicks has yet to provide any specifics such as names and dates that these representatives allegedly spoke to her. So, with respect to the claims involving Elawad, the Court finds that Defendants raise a genuine issue of material fact as to their knowledge of the falsity of claims submitted to these programs. Therefore, the Court DENIES summary judgment as to those 59 claims.

### b.   Claims Submitted Under Maren Johnson

As to Maren Johnson, the Government contends that MGFR submitted 767 claims to government healthcare programs listing her as the rendering provider of therapy services after her employment at MGFR ended. MGFR admits that it did not employ Maren Johnson after January 4, 2018, but continued submitting claims listing her as the rendering provider of services after this date. MGFR admitted that the claims it submitted under her name after January 4, 2018, were rendered by therapy assistants—not by Maren Johnson. The Government contends that because MGFR admitted that its misrepresentation of Maren Johnson as the rendering provider was material and a condition of reimbursement decisions, MGFR has similarly admitted that it knowingly submitted these false claims.

The structure of this argument should look familiar. It is the same structure the Government used in its attempts to show that Defendants knowingly submitted false

claims listing Gamal Elawad as the rendering provider. However, while the structure of the argument looks familiar, the Court's review of the argument should not.

Defendants cannot plausibly use the same defense they used regarding its submission of claims under Elawad's name. When defending the claims against Elawad, recall that Defendants argued that based on the guidance they received from unnamed government healthcare workers, Elawad's "short, periodic terms of incarceration did not prevent him from supervising his physical therapy assistants consistent with the advice and direction . . . received from Medicare and TRICARE." [Doc. 47, p. 8]. But, Maren Johnson's termination, however, would certainly prevent her supervision of assistants. It's easy to see why Defendants didn't even try to rely on that defense here.

Instead, Defendants claim that "what occurred was an innocent mistake or simple negligence[]" on the part of unidentified administrative staff at MGFR. [Doc. 47, p. 7]. Apparently, when Maren Johnson left MGFR in January 2018, "the front office staff at MGFR overlooked making a change in the computer system so as to reflect that the assistants were being supervised by other occupational therapists[.]" [*Id.*]. As a result of this error—which Brenda Hicks claims to know nothing about—MGFR mistakenly continued to submit claims under Maren Johnson's name.

Now, this is certainly an example of "the ostrich type" situation where it appears that Brenda Hicks "buried [her] head in the sand" and "failed to make such simple

inquiries"—such as why did her business submit claims indicating that a terminated employee continued to render services—"that would alert her that false claims were being submitted." *Urquilla-Diaz*, 780 F.3d at 1058 (citation omitted); *see also United States v. Marder*, 208 F.Supp.3d 1296, 1314 (S.D. Fla. 2016) ("Quite simply, a reasonable jury could infer [the defendant's] actual knowledge—or at least his reckless disregard for the veracity of his claims for Medicare reimbursement—simply from the physical impossibility of his seeking payment for services he claimed to have performed or directly supervised despite being absent from the office."). Brenda Hicks ensured that the record was crystal clear that she alone oversaw the submission of claims to these government healthcare programs, admitting that she was "responsible for all of the claims that MGFR submitted . . . during the relevant time frame." [Doc. 47-1, ¶ 5]. As such, the Court cannot accept both her defense that the front office overlooked a vital change in the system, as well as her position that she was the sole person responsible for submitting claims. To accept the latter and then accept that she had no idea that these claims listed the name of a terminated employee makes no logical sense. At bare minimum, she was "required to take reasonable steps to ensure that her [healthcare organization's] claims for reimbursement were accurate. Failure to do so demonstrates 'reckless disregard.'" *United States v. Stevens*, 605 F.Supp.2d 863, 869 (W.D. Ky. 2008) (discussing *United States v. Krizek*, 111 F.3d 934 (D.C. Cir. 1997)).

While Defendants attempt to categorize this situation as "mere negligence" or an "honest mistake," the record clearly shows that this is so much more. MGFR did not employ Maren Johnson after January 4, 2018. And yet, MGFR continued to submit claims under her name for the *next eight months*—up until September 17, 2018. Over the course of these eight months, Defendants submitted 100 claims to Medicaid (11 claims to Anthem, Inc., 3 claims to Peach State Health plan, and 86 claims to the Georgia Department of Community Health) and 667 claims to TRICARE that listed Maren Johnson as the rendering provider of therapy services. Upon review of these facts, the Court finds it difficult to accept the argument that this was just an "honest mistake." No, this epitomizes "reckless disregard" of the truth because she "kn[ew] or ha[d] reason to know of facts that would lead a reasonable person to realize that harm [would be] the likely result of [submitting claims under Maren Johnson's name]." *Urquilla-Diaz*, 780 F.3d at 1058 (quoting *United States v. King-Vassel*, 728 F.3d 707, 713 (7th Cir. 2013)).

The Court concludes that the Government established that Brenda Hicks and MGFR acted with the requisite scienter—knowledge—when submitting false claims under Maren Johnson's name for services rendered after January 4, 2018. As noted earlier, the Court finds that Defendants' judicial admissions establish the other elements to the FCA and FMCA claims. The Court will set a hearing to determine the amount of damages owed.

3.       **Claims Under Cassandra Frazier**

The Government contends that Defendants submitted 236 claims (53 claims to

TRICARE, 2 claims to Medicare, 22 claims to Anthem, Inc., 13 claims to Peach State

Health Plan, and 146 claims to the Georgia Department of Community Health) to

government healthcare programs listing Cassandra Frazier as the rendering provider of

speech pathology services when (1) when she was physically outside the state of

Georgia; and (2) when she was no longer employed at MGFR. The Court conducts

separate analyses as to each set of claims

*a.       Out-of-State Travel Claims*

The Government claims that Defendants knowingly submitted the following

false claims: 72 claims to Medicaid and 9 claims to TRICARE for dates when Frazier

visited Washington, D.C., in May 2015; then, 73 claims to Medicaid and 10 claims to

TRICARE for dates when Frazier visited Florida in May and June 2015; and 25 claims to

Medicaid and 5 claims to TRICARE for dates when Frazier visited Florida in October

2015. The Government contends that Defendants knowingly misrepresented that

Frazier rendered speech therapy services on the relevant dates.

Once, again, the Court starts with the admissions. MGFR admits that it

submitted claims under Frazier's name on dates when she was traveling outside the

state of Georgia. It admits that these claims listed Frazier as the provider rendering

services, but such services were actually rendered by an entirely different provider—

not Frazier. On top of this, MGFR admits that its misrepresentations of Frazier as the rendering provider were material to and a condition of reimbursement decisions. The Government contends that these admissions clearly show that Defendants *knowingly* presented false claims and made, used or caused to be made or used, false statements.

In response, Defendants raise a familiar defense. They claim to have believed, based on advisement from Medicare and TRICARE representatives, that they could list Frazier as the rendering service provider (despite her assistants being the ones to render services), so long as Frazier made onsite supervisory visits every 30 days. There is nothing in the record to suggest that Frazier's travels prevented her from supervising assistants consistent with the aforementioned advisement. As with Elawad, the Court finds that Defendants raise a genuine issue of material fact as to whether they *knowingly* presented false claims or made, used or caused to be made or used, false statements. The analysis mirrors the analysis regarding those claims that Defendants submitted under Elawad's name on dates he was incarcerated. For the reasons the Court denied summary judgment as to those claims submitted under Elawad's name, the Court DENIES summary judgment as to the claims submitted under Frazier's name on those dates she traveled outside the state.

b.    *Resignation Claims*

The Court finds that the analysis detailed above does not pertain to all claims at issue submitted under Frazier's name. On November 10, 2015, Frazier resigned from

MGFR. However, despite her resignation, Defendants submitted 1 claim to Medicare, 11 claims to Medicaid, and 29 claims to TRICARE. In a most egregious example, Defendants submitted a claim to TRICARE for services allegedly rendered by Frazier on September 14, 2016—more than 10 months after her resignation.

The Court finds that the analysis applicable to this set of claims mirrors the analysis regarding the claims submitted under Maren Johnson's name after her employment at MGFR ended. Defendants argue that after Frazier resigned from MGFR, "the office staff overlooked making a change in the computer system so as to reflect that the assistants were being supervised by other speech language therapists[,]" and not by Frazier. [Doc. 47, p. 1]. Brenda Hicks claims that she was unaware that her staff overlooked such a change, and "as a result[,] MGFR mistakenly sent out claims under the name of the wrong speech language pathologist[]"—Frazier. [*Id.*].

As discussed above, Brenda Hicks acted in reckless disregard when she failed to take reasonable steps to ensure that claims she submitted did not list an individual who had resigned from her practice as the rendering provider of services. For the same reasons the Court found that Defendants acted with reckless disregard to those claims submitted under Maren Johnson's name, it finds that Defendants also acted with reckless disregard to the submission of claims under Frazier's name after her resignation. The Court concludes that the Government has established that Defendants acted with the requisite scienter when submitting this subset of false claims. As all other

elements of the FCA and FMCA claims were established, the Court GRANTS summary judgment as to those claims submitted under the name of Maren Johnson after January 4, 2018.

### C.    Hearing on Damages

Since the Government has established as a matter of law that Defendants are liable for various FCA and GFMCA violations, the Court must now consider the imposition of damages. "FCA damages 'typically are liberally calculated to ensure that they afford the government complete indemnity for the injuries done it." *United States ex. Rel. Doe v. DeGregorio*, F.Supp.2d 877, 890 (M.D. Fla. 2007) (quoting *United States ex rel. Roby v. Boeing Co.*, 302 F.3d 637, 646 (6th Cir. 2002)). As a starting point, any person or entity found liable under the FCA is subject to a civil penalty somewhere between $5,500 and $11,000 for each identifiable demand for payment. 31 U.S.C. § 3729(a)(1). The imposition of civil penalties is mandatory for each false claim. *U.S. v. Killough*, 848 F.2d 1523, 1533 (11th Cir. 1988). However, there is no "specific formula for imposing civil penalties," rather, "federal trial courts [may] award monetary relief that will afford the government a basis civil penalty amount that can be adjusted, in a court's discretion, up to the statutory ceiling." *Morse Diesel Int'l, Inc., v. United States*, 79 Fed. Cl. 116, 124 (Fed. Cir. 2007). In addition, a liable party is subject to treble damages and the Government's costs associated with bringing the suit. 31 U.S.C. § 3729(a)(3).

As it relates to the imposition of statutory fines and penalties, the Court finds it beneficial to discuss the matter in full at a hearing to occur no later than 30 days from entry of this Order.

## <u>CONCLUSION</u>

For the reasons discussed above, the Court **GRANTS in Part** and **DENIES in Part** the Government's Partial Motion for Summary Judgment [Doc. 41]. It is **GRANTED** in favor of the Government against Defendants as to the (1) 767 claims that MGFR submitted to government healthcare programs under Maren Johnson's name after January 4, 2018, and (2) those claims that MGFR submitted to government healthcare programs under Cassandra Frazier's name after her resignation on November 10, 2015. It is **DENIED** as to the (1) 59 claims that MGFR submitted to government healthcare programs under Gamal Elawad's name during the time he was incarcerated, and (2) the claims that MGFR submitted to government healthcare programs under Cassandra Frazier's name while she was traveling outside the state of Georgia.

**SO ORDERED**, this 20th day of April, 2022.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**